UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ON PETITION FOR WRIT OF HABEAS CORPUS

No. 4:20-CV-40084

---

BRUCE COOPER,
Petitioner,

v.

MATTHEW DIVRIS,
Superintendent, NCCI-Gardner,
Respondent

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR A WRIT OF HEABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254 BY A PERSON IN STATE CUSTODY

Bruce Cooper was denied his Sixth Amendment right to the effective assistance of counsel when trial counsel failed to present exculpatory evidence to the jury.

I.    PROCEDURAL HISTORY OF CONVICTION AND SENTENCE

On September 27, 2010, the Bristol County Grand Jury returned indictments charging Bruce Cooper with indecent assault and battery on a child under fourteen, statutory rape, and two counts of aggravated statutory rape with respect to "RC"; and one

1

count of indecent assault and battery with respect to "JC".[1] On July 16, 2012, a jury returned guilty verdicts on all charges except the charge pertaining to JC. On July 26, 2012, Judge D. Lloyd MacDonald sentenced Mr. Cooper to concurrent 10-15 year prison terms on the aggravated statutory rape charges, and concurrent 10 years of probation on the other two charges to run from and after the prison term.

Mr. Cooper timely appealed to the Massachusetts Appeals Court. While that appeal was stayed, Mr. Cooper filed, and Judge Merita Hopkins denied, a motion for new trial. Mr. Cooper timely appealed from that denial and the two appeals were then consolidated in the Appeals Court. On December 19, 2019, the Appeals Court affirmed the two aggravated statutory rape convictions; the Court vacated and dismissed the other two convictions. A copy of the decision, *Commonwealth* v. *Cooper*, 94 Mass. App. Ct. 1114 (2018) (Rubin, Sacks & Shin, JJ.), is appended. Mr. Cooper then filed a petition for re-hearing in the

---

[1] The six-volume trial transcript is cited by volume and page number as "(Tr.___.___)".

Appeals Court, which was denied: "After receipt of the full,

unredacted video, and after further review, the petition for

rehearing is denied by a majority of the panel (Sacks & Shin,

JJ.). Justice Rubin would allow the petition." Mr. Cooper timely

filed an application for further appellate review in the

Massachusetts Supreme Judicial Court, which was denied on April

5, 2019.

## II.  JURISDICTION

Petitioner is a prisoner in state custody at North Central

Correctional Institution (NCCI) in Gardner, Massachusetts.

Matthew Divris, Respondent, is the Superintendent of NCCI-

Gardner. Petitioner asserts that his convictions and sentences

are in violation of the Constitution and laws of the United

States. He seeks relief under 28 U.S.C. § 2254.

## III. FACTUAL SUMMARY

### A. Evidence of Pre-July 30, 2009 Events

RC testified that she was born in 1994 and lived in a

tropical region of Australia. (Tr.II.20,78). Her mother raised

her and her younger sister JC. (Tr.II.167). In 2001, RC's mother married Mr. Cooper. (Tr.II.24,141).

When RC was seven years old, her grandfather began touching her. (Tr.II.40). She testified he put his fingers and other objects inside her vagina every couple of weeks from when she was seven until she was twelve, but he never put his penis inside her. (Tr.II.41).

RC testified that in March 2004, Mr. Cooper started "humping" her. (Tr.II.25). She explained that every couple of weeks, he would lie on top of her and make an up and down motion. (Tr.II.27). She claimed that around August 2004, he began rubbing ice cubes inside her vagina. (Tr.II.27). She later testified that Mr. Cooper never placed objects inside her. (Tr.II.43).

The Coopers moved to 69 Circular Street in North Attleboro on October 11, 2004. (Tr.II.22, III.12). RC conceded that it was a bit tough leaving the tropical area, her favorite activities, her friends, and her favorite person in the world -- her Aunt Rosie. (Tr.II.81-99).

4

Mrs. Cooper testified that they came to the United States because she obtained a full-time job as a nurse. (Tr.II.29). RC claimed that her mother worked more than 60-70 hours per week. (Tr.II.29,112). Mrs. Cooper asserted that she was not even allowed to work 60 to 70 hours per week. (Tr.III.145).

RC testified that after the move, Mr. Cooper also began touching her under her clothes. (Tr.II.30). She indicated that he only touched her with his hands at that time. (Tr.II.30). Mrs. Cooper, however, testified that RC and JC loved being with Mr. Cooper. (Tr.III.63).

In 2006, Mr. Cooper began working full time. (Tr.III.53). After Mrs. Cooper injured her shoulder in March of that year, the family moved to a house on Fisher Street in North Attleboro. (Tr.III.55). Mrs. Cooper's injury led her to stop working from January 2007 until October or November 2010. (Tr.II.66, III.56). According to RC, her mother was not out of the house often except for Thursday nights with her friend Kathy. (Tr.II.66). JC testified that her mother would leave to go grocery shopping or

5

to be with friends. (Tr.II.170). Mrs. Cooper testified that she rarely left the house, other than occasionally going to Twin River Casino with Kathy. (Tr.III.66).

While living on Fisher Street, the Coopers became friends with Regina Boffi's family. (Tr.III.65, IV.121). Ms. Boffi testified that she saw Mrs. Cooper leave her home alone frequently. (Tr.IV.153). Mrs. Boffi further noted that Mrs. Cooper once told her that though she and Mr. Cooper had not been getting along, she needed birth control because he "knew how to perform in the bedroom." (Tr.IV.156).

RC testified that when she was eleven or twelve, Mr. Cooper began to touch her with his penis. (Tr.II.31). He would also put his finger inside her vagina. (Tr.II.31). She then asserted that he did not touch her vagina with anything other than his hand and his penis. (Tr.II.31). She later maintained that she "messed up" and that he also placed his mouth on her vagina. (Tr.II.34).

In August or September 2007, RC, her sister and her mother went back to Australia. (Tr.II.41,90, Tr.III.67). RC then told

6

her mother what her grandfather had done to her. (Tr.II.42, III.68). RC admitted that after disclosing this abuse to her mother and other people, they asked if anybody else touched her, and she said no. (Tr.II.92).

According Mrs. Cooper, July 2008 was the last time she and Mr. Cooper had intimate relations. (Tr.III.112). She recalled that he was able to have an erection "sporadically without a great deal of success." (Tr.III.112). He was, however, able to ejaculate. (Tr.III.112). She also testified that Mr. Cooper had low hormone levels. (Tr.III.150).

RC believed that prior to 2008, Mr. Cooper penetrated her vagina "only a couple of times", but between 2008 and June 2009 he penetrated her vagina "lots". (Tr.II.38). During those instances of penetration, JC would either be with her mom, asleep on the couch, or at her friend's house. If her mother was not with JC, she would either be at work or visiting her friend Kathy. (Tr.II.38).

RC was not aware of any issues with respect to Mr. Cooper's ability to have an erection. (Tr.II.37). She noted that he would sometimes ejaculate. (Tr.II.37). She specifically recalled that the last incident before she disclosed was in June 2009, and he ejaculated inside. (Tr.II.37). She testified that Mr. Cooper never wore a condom. (Tr.II.45).

JC claimed that Mr. Cooper first touched her when she was five or six. (Tr.II.172). She later testified that he started touching her when she was six or seven. (Tr.II.175). She testified that her mother and sister would be in the living room while this happened. (Tr.II.176). She recalled that it stopped when she was between eight or nine years old. (Tr.II.175). At some point, RC asked JC if something had happened with Mr. Cooper. JC indicated that he just tickled her. (Tr.II.152).

### B. Facts of July 30 – August 3, 2009

On July 30, 2009, RC, her mother, her sister, Ms. Boffi, and Ms. Boffi's daughter Sam traveled to a water park in Danvers called Coco Keys. (Tr.II.46). RC recalled that her menstrual

periods were irregular at that time, and she had not had her period in a while. (Tr.II.46). Ms. Boffi testified that RC said that she was late for getting her period. (Tr.IV.127). Mrs. Cooper, however, testified that RC did not mention anything about having missed her period. (Tr.III.74). Mrs. Cooper added, "[RC] hadn't even started getting her periods; not long regular anyway." (Tr.III.74).

The following day, Ms. Boffi jokingly suggested that RC might be pregnant. (Tr.II.47, IV.127). RC testified that she started to "freak out" because it had only been about a month since Mr. Cooper ejaculated "like sort of inside." (Tr.II.47). She then asked Ms. Boffi to take Sam and JC from their hotel to the park. (Tr.II.47).

While lying beside her mother, RC said that Mr. Cooper had sex with her. (Tr.II.48). Mrs. Cooper then called Mr. Cooper. (Tr.II.49). RC claimed that her mother was still hugging her. (Tr.II.49). Mrs. Cooper testified that she had walked near the window. (Tr.III.77,136). RC claimed that she could hear Mr.

Cooper say something, "No, nothing happening." (Tr.II.49). He then stated something akin to "[O]kay, but I used a condom." (Tr.II.49). She then told her mother that was incorrect. (Tr.II.49).

Mrs. Cooper testified that Mr. Cooper never said anything about a condom. (Tr.III.77). Mrs. Cooper also noted that the volume on her cell phone was low. (Tr.III.137). She added that Mr. Cooper never made any admissions and that he said, "No, no, I've only had affection for [RC]." (Tr.III.83).

Five minutes later, Mrs. Cooper called the North Attleboro Police. (Tr.III.78). She testified that she was not in a rational state at that point. (Tr.III.170). She did not recall saying anything about Mr. Cooper telling her it could not have happened because he wore a condom. (Tr.III.78). She asserted that she never made such a statement to RC. (Tr.III.78). She also admitted that she might have exaggerated during the call to the police. (Tr.III.173).

A tape recording of that call was played to the jury. (Tr.III.81). On the recording, Mrs. Cooper said that RC had not had her period in three months. Mrs. Cooper testified that she did not actually know that RC had not had her period for three months. (Tr.III.173). The recording additionally contained an assertion by Mrs. Cooper that Mr. Cooper had admitted to the alleged actions. (Tr.III.86). She testified that she was in a rage while speaking with Mr. Cooper. (Tr.III,124). She described Mr. Cooper as a very passive person and explained that in their marriage he would say things all the time to placate her. (Tr.III.125). She testified that his statement to her on the phone of, "Whatever. You do what you've got to do", was an instance of him being passive in response to her assertion that she was going to call the police. (Tr.III.168). In addition, the recording revealed that at no point did Mrs. Cooper say that Mr. Cooper told her that he wore a condom.

Mrs. Cooper then went to get Ms. Boffi and the children. (Tr.II.50). Ms. Boffi testified that Mrs. Cooper told her that RC

11

claimed that Mr. Cooper had been molesting her. (Tr.IV.128). Ms. Boffi further maintained that Mrs. Cooper told her that Mr. Cooper had said that there was no way RC could be pregnant because he used a condom. (Tr.IV.130). When they returned to the hotel room, Mrs. Cooper called RC's counselor. (Tr.II.50). RC testified that she had previously only spoken to her counselor about her grandfather. (Tr.II.51). That afternoon RC went with Ms. Boffi and purchased a pregnancy test. (Tr.II.52, IV. 129). She administered the test and received negative results. (Tr.II.52).

North Attleboro Police Detective John Reilly testified that on July 31, 2009, he called Mrs. Cooper. (Tr.IV.60). According to the detective, she informed him that she was still at the water park. (Tr.IV.60). He claimed that she was "frantic" when she told him that her husband had raped RC. (Tr.IV.61). Mrs. Cooper then told the detective that after she detailed RC's allegations, her husband admitted. (Tr.IV.61). The detective recommended that she not have any additional conversation with her husband and not

speak further about the matter with RC. (Tr.IV.63). They then agreed to meet the next day. (Tr.IV.64).

At about 4 p.m., Mrs. Cooper left to go home to speak with Mr. Cooper. (Tr.II.52). She stated, "He initially denied everything. Then he said that [RC] had started coming onto him trying to do stuff to him." (Tr.III.92). She said he told her that RC would try to get in the shower with him and also try to touch him in bed. (Tr.III.92). He informed her that this had been going on for months and he had tried to tell her. (Tr.III.93). He also denied that he ever had sex with RC. (Tr.III.92).

Mrs. Cooper returned to Coco Keys at about 7 a.m. (Tr.II. 52). Mrs. Boffi testified that Mrs. Cooper told her that RC instigated the sexual relations, and that Mr. Cooper told Mrs. Cooper that he was "only doing that" because RC reminded him of Mrs. Cooper. (Tr.IV.144,165). Mrs. Cooper testified that at some point that day RC told her "it had not happened" and she was sorry. (Tr.III.97). She asserted that at no time did she encourage RC to recant. (Tr.III.105).

13

When they arrived home from Coco Keys, RC went to Ms. Boffi's house across the street so she did not have to see Mr. Cooper. (Tr.II.54). She noted that her sister remained with her mother and Mr. Cooper. (Tr.II.55). JC testified that she heard her mother and Mr. Cooper talking about "why he had to do it to [RC] when they're married." (Tr.III.10). RC returned home on or about August 2, 2009, after Mr. Cooper had moved into a hotel. (Tr.II.55,56).

On Monday, August 3, 2009, Mrs. Cooper met with Detective Reilly. (Tr.IV.66). Mrs. Cooper asserted that the matter had been blown out of proportion. (Tr.IV.67). She told the detective that Mr. Cooper had denied the allegations. (Tr.IV.67). Mrs. Cooper also told Detective Reilly that RC had made sexual advances towards Mr. Cooper. (Tr.IV.68). According to the detective, Mrs. Cooper never mentioned any sexual dysfunction of Mr. Cooper. (Tr.IV.69). Nor did she mention any recantation by RC. (Tr.IV.69). Mrs. Cooper, however, recalled telling Detective John Reilly that RC recanted. (Tr.III.98).

14

### C. August 4, 2009

On August 4, 2009, RC participated in a "Sexual Assault Intervention Network" (SAIN) interview. (Tr.II.56,57). A video of that interview was played for the jury. (Tr.II.109). At the beginning of the interview RC admitted that she had been trying to get her Australian accent back because she wanted to return. (Tr.II.110). She then stated that nobody had told her there were things that she should not say.

In the interview, RC claimed that when she was about ten, Mr. Cooper would start a humping motion while they cuddled on the couch. She stated that after eight or nine months he began touching her "boobs" over her clothes. He would touch her private area over her clothes when her mother was at work or out with a friend. She claimed that she saw his privates, but only once or twice. He never asked her to touch his "private body part." He also never told her not to tell anyone. She denied multiple times that he ever had intercourse with her. She added "I'm telling you

the honest to God truth" and nobody told her not to say that he did not have sex with her. (Tr.II.121).

She told the interviewer that when Ms. Boffi jokingly said that she might be pregnant, she knew that could not be the case because Mr. Cooper had never gone "inside" her. She, however, was experiencing severe stomach pains. She explained that she lied because she could not control her emotions and anger. She asserted that this was simply a misunderstanding because of what happened with her grandfather previously. (Tr.II.127).

She additionally told the interviewer that she had learned from her mother that Mr. Cooper was a "basket case" and has said he was sorry. RC further noted that her Aunt Rosie was a person to whom she could tell anything. She, however, had not yet told Aunt Rosie about her allegations.

RC testified at trial that she changed her story for the interview "because stemming from Mom changing in Coco Keys, she was just like don't say anything." (Tr.II.56). She added that her mom told her to make sure she said that there was no intercourse.

(Tr.II.136). She, however, testified earlier that her mom told her to tell the truth. (Tr.II.110).

Later on August 4, 2009, Mrs. Cooper spoke to Detective Reilly and Kim Urquhart from DCF. (Tr.III.86). She indicated that Mr. Cooper admitted to touching RC. (Tr.III.87). She also said that he told her that he knew it was wrong and he stopped right away. (Tr.III.87). Detective Reilly similarly testified that Mrs. Cooper said that Mr. Cooper admitted to touching RC and stopped because he knew it was wrong. (Tr.IV.72). He additionally claimed that Mrs. Cooper said that she had previously witnessed RC "humping" on top of her husband. (Tr.IV.73).

Mrs. Cooper recalled that RC refused to go see a forensic nurse. (Tr.III.102). Mrs. Cooper explained that she knew from her experience working with many rape victims as a nurse that it would be almost impossible for an examiner to discern whether any findings had been caused by Mr. Cooper or by RC's grandfather. (Tr.III.120).

### D.   August 6, 2009 & Related Intra-Trial Conferences

At the beginning of the third day of the trial, the prosecutor stated that she had created a document identifying the portions of the recording of the August 6, 2009, interview of Mr. Cooper by Detective Arrighi that she intended to play. (Tr.III. 4). Defense counsel asserted that the Commonwealth's request made it seem like Mr. Cooper had admitted because previous statements by the officer would be omitted. He also noted that those previous statements were detrimental to the defense. (Tr.III.5).

At the end of the third day of trial the prosecutor provided a redacted video. (Tr.III.220). Defense counsel then argued, "[T]he problem I have is … the officer is pounding on him. … And he makes statements trying to defend himself. And what we're going to do is we're going to take the statements he's making trying to defend himself and turn around and make those sound like consciousness of guilt." (Tr.III.221).

After viewing the redacted video with the judge, defense counsel maintained, "[I]t's a bunch of statements taken out of

context." (Tr.III.223). After conveying that he did not have a copy of the original recording, the judge told defense counsel, "[I]f you wish more of the interview in, then you're free to designate that." (Tr.III.229).

On the fourth day of trial, another discussion commenced concerning the video. (Tr.IV.6). Defense counsel asserted that it "doesn't show the manner he's been treated through the rest of the video." At that point the judge declared, "I want the record to be clear, Mr. Connors, you have the right to play any other part of the interview that you wish …" (Tr.IV.7).

Later that day, the prosecutor called Detective Daniel Arrighi as a witness. (Tr.IV.100). He testified that on August 6, 2009, he arrested Mr. Cooper and then recorded their interview at the police station. (Tr.IV.101). The detective asserted that Mr. Cooper was extremely nervous. (Tr.IV.103). He added that Mr. Cooper was at times lost for words and unable to give a plausible explanation. (Tr.IV.104).

After her direct examination of Detective Arrighi, the prosecutor offered the redacted video recording into evidence. (Tr.IV.104). The judge then stated in open court, "I'm going to allow it to be played. I will inform the jury that … it has been, what we call, 'redacted' … Mr. Connors may object to its completeness, but he'll have the opportunity to play other parts of it." (Tr.IV.105).

The video, which was transcribed after the conclusion of the trial, commenced with Detective Arrighi obtaining biographical information from Mr. Cooper. After Mr. Cooper re-affirmed that RC was his stepdaughter, the recording cut to him stating, "I mean [RC] is … a little bit promiscuous …" The detective stated that he needed to hear about RC's promiscuousness. Mr. Cooper explained that two or three times RC got into bed with him, and started touching his penis. He said that he "freak[ed] out," told her not to do that and sent her out of the room.

Detective Arrighi asked Mr. Cooper if he ever exposed himself to RC. Mr. Cooper said no and added that RC would come

into the bathroom when he was urinating. He also stated that six weeks prior he was taking a shower and when RC entered naked he pushed her out.

The recording next showed Mr. Cooper relaying that RC, while lying across him on the couch, asked if that was "humping." Mr. Cooper said he told her, "[RC], that's not right." The video cut to the detective asking Mr. Cooper, "What happened in Myrtle Beach?" Mr. Cooper explained that RC tried to touch him while in a spa.

At that point the recording cut to the detective re-asking Mr. Cooper if anything took place with RC in her mother's bedroom. Mr. Cooper re-explained that RC had come into the bedroom and tried get under the covers and touch him. He denied touching her back. He again asserted that this happened about three times. He also told his wife that there were issues with RC, but she did not believe him.

After the ninth cut, the recording showed Mr. Cooper explaining that because of this issue he was no longer living at

the house. After the twelfth cut, Detective Arrighi recapped Mr.
Cooper's assertions concerning RC touching him in the bedroom and
coming into the shower. The detective then re-delved into why Mr.
Cooper was not living with his family. Mr. Cooper asserted his
belief that his wife wanted him to come home, and he just had
dinner with them. The recording cut again and picked up with Mr.
Cooper stating that RC had obviously been affected by the
mistreatment by her grandfather. Mr. Cooper explained that the
"humping" incident showed how she had been impacted by her
grandfather's mistreatment.

The detective then asked, "Did you confide in your wife at
all as far as what has been going on between you and RC,
honestly?" He noted that he informed his wife that RC would try
to touch him and that she would look at him while he was peeing.
The recording cut for the fourteenth time to Mr. Cooper stating,
"I haven't worn a condom in my whole entire life." The recording,
yet again, cut to Mr. Cooper noting that it is extraordinarily
difficult for him to achieve an erection due to high blood

pressure. After multiple additional cuts, the video displayed Mr.
Cooper stating, "[RC] has never, ever seen to my knowledge a
condom. I mean I know she hasn't … You know, I can't say I know
she hasn't, but not -- she's never seen a condom with me." The
recording then cut for the eighteenth time and displayed Mr.
Cooper stating, "I may have said sorry that I never -- pushed the
issue of [RC]'s behavior." The recording cut again to Mr. Cooper
adding that he told his wife about the incident in the shower six
weeks ago. Detective Arrighi subsequently asked "Why wouldn't you
tell [your wife] that in the past [RC's] done some humping with
you …?" Mr. Cooper responded that he probably did tell his wife
in passing and asked her "[H]ow did [RC] know about the word
humping because --." At that point the recoding stopped.

During cross-examination of Detective Arrighi, the judge
sustained an objection to defense counsel's question, "There's a
lot that's not on this video, correct?" (Tr.IV.111). The judge
added that the jury had already been informed that the video was

redacted and again told defense counsel that if he wished more to

be played he "may have it played." (Tr.IV.111).

### E. Rest of August 2009

Kim Urquhart testified that she was the DCF social worker

assigned to the family of Mrs. Cooper. (Tr.III.187). On August

27, 2009, RC and her sister were placed in foster care. (Tr.III.

188). Ms. Urquhart conceded that on August 28, 2009, RC told her

that she was upset because she felt like she had "messed things

up" in her family and it was all her fault. (Tr.III.195). Ms.

Urquhart also admitted that Mrs. Cooper told her that RC fully

recanted. (Tr.III.198). In addition, RC testified that in August

2009, she told the prosecutor, Officer Reilly, and Kim Urquhart

that nothing happened with Mr. Cooper. (Tr.II.95).

RC also testified that in August 2009, she heard it

mentioned that she had had flashbacks to her abuse by her

grandfather, but she never said that had happened. (Tr.II.96).

Mrs. Cooper, however, testified that she reported to DCF that RC

informed her she was having flashbacks about the abuse by her grandfather. (Tr.III.120).

JC testified that in August 2009, she told a DCF worker that she heard her mother say that Mr. Cooper touched RC in the wrong place. (Tr.III.21). JC then denied that Mr. Cooper had ever touched her in a bad way. (Tr.III.22). Mrs. Cooper testified that she asked JC many times whether Mr. Cooper had abused her and she always denied it. (Tr.III.132).

### F. Rest of 2009 Facts

Around the beginning of September 2009, RC received a physical. RC told the nurse that her grandfather molested her while living in Australia. (Tr.II.102). RC also testified that she could not remember whether she told the nurse anything about Mr. Cooper. (Tr.II.102).

RC testified that she and JC had supervised visits with their mother once per week. (Tr.II.59). Ms. Urquhart testified that there were times when Mrs. Cooper would be prevented from visiting due to improper actions such as whispering inappropriate

things to the girls. (Tr.III.199). Mrs. Cooper asserted that if she did not cooperate with DCF, the supervised visits would cease. (Tr.III.147). She asserted that DCF "crucified" her for continuing to note that RC had recanted. (Tr.III.120). She added, "I tried to agree with people so I would get to see my children." (Tr.III.147).

JC testified that on October 20, 2009, an investigator interviewed her. (Tr.III.15). She admitted that she denied that Mr. Cooper touched her inappropriately, but claimed she did so because she was uncomfortable around those people. (Tr.III.18). She divulged that DCF questioned her many times. (Tr.III.30). She conceded that gradually her story changed from Mr. Cooper just tickled her to Mr. Cooper "touched" her. (Tr.III.31).

Ms. Urquhart admitted that RC recanted in December 2009. (Tr.III.199). RC testified that she did that because her mom pressured her. (Tr.II.61). On December 22, 2009, RC maintained that nothing had happened with Mr. Cooper. (Tr.II.62). She, however, claimed that that same day she told her foster mother

that it did happen. (Tr.II.162). She asserted that she asked for immunity and the prosecutor told her it would be granted. (Tr.II. 154). She also stated that the prosecutor's office threatened her about changing her story. (Tr.II.153).

According to Ms. Boffi, on or about Christmas Eve 2009, she had a conversation with Mrs. Cooper. (Tr.IV.157). Mrs. Boffi testified that Mrs. Cooper told her that Mr. Cooper was impotent. (Tr.IV.156).

### G. Facts 2010–2012

RC testified that in January 2010 she told a nurse during a gynecological exam that she had been abused by her grandfather, but she did not say anything about Mr. Cooper. (Tr.II.62,91). Ann Parsons testified that she was the pediatric nurse who examined RC on January 25, 2010. (Tr.IV.19). She testified that when she does examinations, an understanding of the child's past trauma helps her to focus. (Tr.IV.20). She noted that in RC's case neither a sexual assault kit nor an internal GYN exam were done. (Tr.IV.22). Her examination of RC's hymenal rim fulfilled the

criteria for an indeterminate examination. (Tr.IV.31). She

explained that a notch was found in RC's hymen, but it was not

diagnostic or suggestive of penetrative trauma. (Tr.IV.29). She

also testified that RC was asked whether she had a prior sexual

encounter and RC told her that there had been ejaculation.

(Tr.IV.39,52). RC provided information indicating that she had

been sexually abused from the ages of seven to ten by her

grandfather. (Tr.IV.54). Ms. Parsons testified that she "knew of

one prior sexual encounter." (Tr.IV.)

In March or April 2010, RC wrote a letter to her mother that

contained details she did not mention in her testimony. (Tr.II.

143). In October 2010, Aunt Rosie came to visit. (Tr.II.99). RC

had disclosed to Aunt Rosie what had happened with her

grandfather, but she never disclosed to her anything that

happened with Mr. Cooper. (Tr.II.99). According to Mrs. Cooper,

Rosie told her that RC had not said anything negative about Mr.

Cooper. (Tr.III.123).

In February of 2011, the girls returned to Australia and RC eventually moved in with Aunt Rosie. (Tr.II.100). RC testified that she enjoyed living with her. (TrII.100). Mrs. Cooper testified that she visited her daughters a number of times in 2011. (Tr.III.113).

Mrs. Cooper also testified that she used to call Mr. Cooper often in 2011, "because to me he had ruined my life. And I would just yell and scream at him …" (Tr.III.88). She recalled that at the beginning of 2011 he said, "Okay Alison, whatever you say. You win. Okay I did it. Whatever you want to say." (Tr.III.88).

On May 25, 2012, Mrs. Cooper met again with Detective Reilly and stated that Mr. Cooper had told her that he only wanted RC to show him some affection. (Tr.III.84). She agreed that that was different than her testimony that Mr. Cooper had said he only had affection for RC. (Tr.III.84). She also noted that she did not mention RC's recantation in August 2009 at that meeting. (Tr.III.99). Detective Reilly, however, admitted that he knew that RC had recanted a number of times. (Tr.IV.84).

29

Detective Reilly testified that on May 25, 2012, Mrs. Cooper reasserted that when she contacted Mr. Cooper on July 31, 2009, he initially denied the abuse allegation, but then admitted to having intercourse with RC. (Tr.IV.75). According to the detective, Mrs. Cooper also revealed that Mr. Cooper made an admission to her in April 2011. (Tr.IV.76). He testified that Mrs. Cooper told him that Mr. Cooper said, "Okay. I did it. I just wanted RC to show me some affection." (Tr.IV.77). The detective also claimed that she told him that Mr. Cooper admitted to being in the shower with RC, touching her breasts, but stopping because he knew it was wrong. (Tr.IV.77).

Detective Reilly testified that on July 3, 2012, he met again with Mrs. Cooper. (Tr.IV.78). He also testified that Mrs. Cooper told him for the first time at that meeting that Mr. Cooper could ejaculate even though he could not get an erection. (Tr.IV.79). Mrs. Cooper agreed that the first time she mentioned Mr. Cooper's erectile issues to anyone in law enforcement was during the July 3, 2012, meeting. (Tr.III.112).

30

The detective conceded that after the meeting in July 2012, he was unsure whether Mrs. Cooper's position was that Mr. Cooper had made inculpatory statements. (Tr.IV.80). He based his lack of clarity on his belief that Mrs. Cooper had gone back and forth on that many times. (Tr.IV.80). He testified that he believed Mrs. Cooper was being deceitful, and she was charged with the felony of giving misleading information. (Tr.IV.87). Her case was resolved on May 25, 2012. (Tr.IV.95).

### H. Defense Case

Margaret Ratay testified that she lived next to the Coopers on Circular Street. (Tr.V.8). She would watch the children when the parents worked. (Tr.V.10). She recalled that Mr. Cooper was often out of the house. (Tr.V.10). Ms. Ratay states that RC resented and disrespected Mr. Cooper. (Tr.V.11). She testified that RC never displayed any fear towards him, but instead was controlling and demanding of Mr. Cooper. (Tr.V.12,18). Ms. Ratay additionally asserted that Mrs. Cooper definitely did not work 70 or 80 hours per week. (Tr.V.18).

Donna Rebello testified that the Coopers moved next to her on Circular Street in October 2004 and they became friends. (Tr.V.38,43). She recalled RC being a bit snide and sarcastic toward Mr. Cooper. (Tr.V.40). Neither child ever exhibited any fear toward Mr. Cooper. (Tr.V.40). Ms. Rebello also recalled RC needing constant attention from her mother. (Tr.V.43).

The final witness for the defense was Attorney Nitin Dalal. (Tr.V.69). He testified that Mrs. Cooper retained him on August 13, 2009, to represent RC. (Tr.V.70). Mrs. Cooper told him that RC told her that Mr. Cooper had sexually molested her. (Tr.V.77). He recalled that on September 9, 2009, Mr. Cooper was brought into the courthouse. He observed that RC and JC appeared thrilled to see him. (Tr.V.70). Attorney Dalal additionally noted that in November 2009 he had a meeting with RC and two assistant district attorneys. (Tr.V.73). During the meeting, RC denied the accusations against Mr. Cooper. (Tr.V.73).

## I. Facts Not Presented At Trial

After the trial, new counsel was appointed to represent Mr.

Cooper and learned of a June 8, 2004, medical report that listed

erectile dysfunction amongst Mr. Cooper's ailments. In addition,

a transcript of Detective Arrighi's interview with Mr. Cooper was

created. Listed below, in order of their appearance on the

unredacted video,[2] are some of the statements by

Mr. Cooper omitted from the jury:

- Responding "Nothing" to the detective asking, "[W]hat's been going on between you and her?"

- Responding "Nothing" when asked, "What else has taken place with her?"

- Twice denying that he thrusted his pelvis in a humping motion with RC.

- Denying that RC had ever been on top of him while she was topless.

- Denying, five consecutive times, ever having intercourse with RC.

---

[2] The Appeals Court reviewed the unredacted video, which was marked for identification at trial as "Exhibit E", after it was forwarded to the Court in support of the petitioner's petition for rehearing.

- Three times denying placing his mouth on RC's breast.

- Denying consensual sexual acts with RC.

- Denying three times ever putting his hands on RC's breasts.

- Twice denying ever putting his hand over the clothes over RC's privates.

- Twice denying ever having told his wife that he touched RC's breasts.

- Saying, "I have never been inappropriate with my stepdaughter."

- Denying fondling RC.

- Asserting, "I would never have intercourse with my daughter."

- Denying that he was not living at home because he had touched RC.

- Responding, "Nothing at all" when asked, "And you never touched her or nothing?"

- Denying the assertion that he had admitted everything to his wife.

- Twice refuting his wife's alleged claim that he told her not to worry because he wore a condom.

- Saying, "No. Never. Never" when asked if he ever told his wife that he had intercourse with RC.

- Asserting, "I have never had sex with her."

- Stating that he never told his wife he wore a condom, to which the detective replied, "[I]t's on tape, and your wife conveyed that to us."

- Denying that he knew why RC would make these claims.

All together 31 denials by Mr. Cooper of sexual contact with RC, and 14 denials by Mr. Cooper of having admitted to his wife that he had sexual contact with RC were redacted. In addition, only the last sentence of the below exchange played for the jury:

Det. Arrighi:   [Y]ou conveyed to your wife — that you had sexual intercourse with [RC], but not to worry, because you were wearing a condom.

Mr. Cooper:   I have never worn a condom. I have never worn a condom in my life. I have – I have medical- not medical, but I have high blood pressure, that's what they tell me, and I cannot even achieve an erection most times.

In an affidavit dated November 4, 2014, trial counsel asserted, "In my estimation the video was a denial by the defendant but every time he denied the charges outright, the police turned his denial around into an accusation. … I believed at the time that the denials when followed by the questions and

responses elicited by the police were not helpful to Bruce

Cooper's case. … If you admit the denial you have to admit what

gave impetus to the denial or else it doesn't make sense. … I

made the decision that putting the denials in would not have

helped the defendant as the denials were preceded by and followed

by damaging statements of the police which gave the denials

context. … In retrospect, I cannot say that my decision on this

was the best. It may have been helpful to include some of the

denials …"

## IV.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of

1996, a federal court may grant a writ of habeas corpus if the

state court ruled in a way contrary to, or involved an

unreasonable application of, clearly established federal law as

determined by the United States Supreme Court. See *Williams* v.

*Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d)(1). An

"unreasonable application" of federal law occurs when the state

court identifies the correct legal principle, but applies those

principles to the facts of the case in an objectively

unreasonable manner. *Malone* v. *Clarke*, 536 F.3d 54, 63 (1st Cir.

2008). Here, the Appeals Court unreasonably applied clearly

established federal law when it concluded that trial counsel's

failure to present exculpatory evidence did not deprive

petitioner of his constitutional right to effective assistance of

counsel.

## V.   CLAIM FOR RELIEF

**The petitioner's trial counsel deprived him of the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution by failing to present exculpatory evidence.**

"Under clearly established federal law as determined by the

Supreme Court, petitioner has a Sixth Amendment right to the

effective assistance of counsel" at all critical stages of the

criminal process. *Yeboah-Sefah* v. *Ficco*, 556 F.3d 53, 68 (1st

Cir. 2009); *Sleeper* v. *Spencer*, 510 F.3d 32,37 (1st Cir. 2007).

"The bench mark for judging any claim of ineffectiveness must be

whether counsel's conduct so undermined the proper functioning of

the adversarial process that the trial cannot be relied on as

having produced a just result." *Strickland* v. *Washington*, 466

U.S. 668, 686 (1984). In making such a showing, a criminal

defendant must satisfy a two-part test. "First, the defendant

must show that counsel's performance was deficient. This requires

showing that counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the

Sixth Amendment. Second, the defendant must show that the

deficient performance prejudiced the defense. This requires

showing that counsel's errors were so serious as to deprive the

defendant of a fair trial, a trial whose result is reliable. *Id*.

at 687.

In this case, petitioner satisfied both prongs of this test,

therefore, the state court's decision to the contrary involved an

unreasonable application of clearly established federal law. 28

U.S.C. § 2254(d)(1).

### A.   Deficient Performance

Counsel's performance is deficient when it falls "below an objective standard of reasonableness," as measured "under prevailing professional norms." *Strickland*, 466 U.S. at 688. Although that "standard is necessarily a general one," *Bobby* v. *Van Hook*, 558 U.S. 4, 7 (2009) (per curiam), the "[r]epresentation of a criminal defendant entails certain basic duties," including the "overarching duty to advocate the defendant's cause" and the "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688.

"An attorney's failure to present available exculpatory evidence is ordinarily deficient, unless some cogent tactical or other consideration justified it." *Griffin* v. *Warden*, *Maryland Corr*. *Adjustment Ctr*., 970 F.2d 1355, 1358 (4th Cir. 1992) (internal quotation marks and citation omitted). Here, petitioner's trial counsel failed to present available exculpatory evidence in the form of 31 denials by Mr. Cooper of

sexual abuse recorded during his interview with Detective

Arrighi. Counsel likewise had 14 separate recorded denials by Mr.

Cooper that he had previously admitted the crimes to his wife.

Counsel's failure to present Mr. Cooper's denials to the jury,

despite permission from the judge to do so, constituted deficient

performance in the circumstances of this case. The Appeals

Court's decision to the contrary involved an unreasonable

application of clearly established federal law.

The Appeals Court found that counsel's failure to present

Mr. Cooper's video recorded denials of the charges, as well as

denials of alleged prior admissions, did not amount to

ineffective assistance. Specifically, the Appeals Court concluded

that with respect to 41 of the 45 omitted denials, trial

counsel's decision was not unreasonable as they "were preceded by

accusatory questions … necessary to give the denials context."

First, the damaging statements within the questions by the

detective were merely cumulative of accusations already submitted

to the jury via the testimony of other Commonwealth witnesses.

They were also cumulative of questions posed by the detective and witnessed by the jury on the redacted video such as: "Did you ever expose yourself to her at all?" and "Did, honestly, did you put your hand on her at all?" As such, the allegedly accusatory questions noted by the Appeals Court would have caused no prejudice to Mr. Cooper.

Instead, learning that Mr. Cooper made 45 denials would likely have altered the jury's interpretation of the tone and focus of that interview. The redacted version of the interview presented to the jury contained no denials of any and all abuse or denials of admitting to his wife, but did include multiple statements by Mr. Cooper that he had been in sexual situations with RC. This allowed the Commonwealth to argue that the jury could easily infer from an admission to being in sexual situations that sexual abuse occurred. That inference definitely would have been less likely had the jury been informed that Mr. Cooper denied any and all abuse 45 times. See *Commonwealth* v. *Barbosa*, 457 Mass. 773, 799 (2010) (concluding that "it is

generally of great value to a defendant for a jury to hear evidence of his prompt, clear, and emphatic denial without his having to testify") (internal quotation marks and empty brackets omitted).

Moreover, at no point did trial counsel elicit from the detective the fact that Mr. Cooper denied sexually abusing RC and denied admitting having done so to his wife. See *Fisher* v. *Gibson*, 282 F.3d 1283, 1297-98 (10th Cir. 2002) (trial counsel's failure to use defendant's "exculpatory statements to rebut the inculpatory nature of the other statements Buffalo Detective Dove testified [defendant] made" constituted deficient performance). Nor did trial counsel even suggest that those denials be submitted as a stipulation. Thus, multiple options existed for defense counsel to present evidence of Mr. Cooper's denials without any risk of harm to the case. In his affidavit, trial counsel conceded, "In retrospect I cannot say that my decision on this was the best. It may have been helpful to include some of the denials …"

The Appeals Court did concede that the statement, "I have never been inappropriate with [the victim]" could have been submitted to the jury without admitting a prior accusatory question. Nonetheless, the Court asserted that it would not have "assisted the defense in any meaningful way, given that, in the portions of the video the jury saw, the defendant acknowledged that "there were inappropriate things happening" and described how the victim would on numerous occasions get into bed and into the shower with him, try to touch his genitals, and watch him urinate." This reasoning is unsound. As previously stated, an admission that the alleged victim acted inappropriately is not the same as an admission that Mr. Copper acted inappropriately. This denial of ever acting inappropriately would not only have been helpful, but as mentioned above, was essential to Mr. Cooper's defense.

The Appeals Court also noted that the omission of three other statements might have constituted ineffective assistance, but added: "we cannot determine the impact that they would have

had without seeing the unredacted video, which is not in the

record. Without the unredacted video, we have no means of

assessing the tone and tenor of the statements or what impression

they might have had on the jury in the context of the interview

as a whole. Thus, on this record, the defendant has failed to

demonstrate prejudice." This understandable, yet incorrect

assertion with respect to the record formed the basis of the

petition for rehearing, which a majority of the panel ultimately

denied: "After receipt of the full, unredacted video, and after

further review, the petition for rehearing is denied by a

majority of the panel (Sacks & Shin, JJ.). Justice Rubin would

allow the petition."

In the end, the Appeals Court's decision involved an

unreasonable application of clearly established federal law

because counsel's decision not to present to the jury exculpatory

portions of Mr. Cooper's statements was unreasonable and

constituted deficient performance. 28 U.S.C. § 2254(d)(1). See

*Moore* v. *Johnson*, 194 F.3d 586, 608-610 (1999) (trial counsel's

44

decision not to use exculpatory portions of the defendant's statements to the police was unreasonable and constituted deficient performance).

## B.   Prejudice

The touchstone of *Strickland*'s prejudice prong is whether counsel's constitutionally deficient performance "'deprive[d] the defendant of a fair trial, a trial whose result is reliable.'" *Harrington* v. *Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 687). "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland*, 466 U.S. at 694. Although the mere possibility of a different outcome is insufficient, the prejudice prong is satisfied when there is "a probability sufficient to undermine confidence in the outcome." *Id.*; see also *Harrington*, 562 U.S. at 112.

Counsel's failure to present the available exculpatory evidence that Mr. Cooper promptly denied all abuse and having

ever admitted to his wife deprived the petitioner "of a fair

trial, a trial whose result is reliable." *Strickland* at 687.

This is especially true given that after the redacted video

played, the judge informed the jury that Mr. Cooper could have

entered into evidence any other part of the video he wished.

(Tr.IV.111). Counsel's failure to enter anything not only

permitted the jury to believe nothing positive for Mr. Cooper

remained, but it also allowed the jury to interpret that as a

negative for Mr. Cooper. The jury knew that Mr. Cooper had been

charged with sexually abusing RC. It also knew that his wife's

claim during the 911 call that he admitted this abuse was the

reason for his arrest. The jury would have reasonably believed

that the detective would have confronted Mr. Cooper about the

charges and alleged admission during the interview. The

combination of the judge's comment and counsel's failure to enter

the denials, very likely led the jury to conclude that when asked

about the charges and the admission during the interview, Mr.

Cooper did not deny anything.

Furthermore, this not a case where lapses by defense counsel can be considered irrelevant due to overwhelming evidence of guilt. That RC changed her story six times alone made the Commonwealth's case far from strong. (Tr.II.48,61,92,95,97). RC first told her mother that Mr. Cooper had been abusing her on July 30, 2009. (Tr.II.48). According to RC's mother, RC completely recanted the following day. (Tr.III.97). During August 4, 2009, SAIN interview RC asserted that she was telling "the honest to God truth" when she said that there had been no intercourse between her and Mr. Cooper. (Tr.V.24:30, 27:00). Later in August of 2009, RC asserted that absolutely nothing inappropriate happened between her and Mr. Cooper. (Tr.II.95).

During the next four months, RC maintained that there had been no abuse. (Tr.II.61,95,97). Detective Reilly and Ms. Urquhart even conceded that they knew that RC had recanted. (Tr.IV.86). RC actually changed her story as she testified. She claimed that Mr. Cooper rubbed ice cubes inside her vagina. (Tr.II.27). She, however, later testified that Mr. Cooper never

placed objects inside of her. (Tr.II.43). She also testified that she was not sure if Mr. Cooper would watch her when her mother was at work. (Tr.II.25). She then asserted that he did not touch her vagina with anything other than his hand and his penis, but later claimed that she "messed up" and that he also placed his mouth on her vagina. (Tr.II.31,34). She additionally asserted that her mom told her to say during the SAIN interview that there was no intercourse. (Tr.II.136). She, however, previously testified that her mom told her to tell the truth. (Tr.II.110). These inconsistencies reasonably allow for a negative evaluation of RC's credibility.

Moreover, though RC asserted that during 2008 and 2009 Mr. Cooper penetrated her vagina "lots," she also testified that her mother rarely left the house during that period. (Tr.II.38,66). Thus, the Commonwealth's case hinged on the unlikely scenario that Mr. Cooper had sex with RC while her mother was home. RC also noted that when she divulged her abuse by her grandfather, people asked if anybody else touched her, and she said no.

(Tr.II.92). She even admitted that when she saw a nurse she only referenced the abuse by her grandfather. (Tr.II.91). These credulity straining claims and omissions definitely decreased the strength of the Commonwealth's case.

Even more striking was RC's admission that the prosecutor assured her of immunity, and threatened her about changing her story. (Tr.II.153,154). Moreover, there was no physical evidence indicating that Mr. Cooper had committed the alleged crimes. There, instead, was a motive to lie: RC's desire to return to Australia. (Tr.II.99, 109). Thus, had the evidence erroneously omitted by defense counsel been entered, RC's claims of rape and abuse might have been found to be as insufficiently credible as those made by JC.

## VII. PRAYER FOR RELIEF

Wherefore, the Petitioner prays that the Court order that the writ of habeas corpus issue and the Petitioner be ordered released and granted a new trial.

Respectfully submitted,
Bruce Cooper
By his attorney,

/s/ Tim St. Lawrence

_____

Timothy St. Lawrence
BBO #676899
11 S Angell St #252
Providence RI 02906
401 484 7850
tstlawrence@gmail.com

Dated: July 2, 2020